THE HONORABLE MARSHA J. PECHMAN

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | |
|---|---|
| In re COINSTAR, INC., SHAREHOLDER DERIVATIVE LITIGATION | Lead Case No. 2:11-cv-00133-MJP |
| This Document Relates To: ALL ACTIONS. | PLAINTIFFS' CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT AND UNJUST ENRICHMENT |
| | <u>DEMAND FOR JURY TRIAL</u> |



ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

## OVERVIEW OF THE ACTION

1. This is a shareholders derivative action on behalf of nominal defendant Coinstar Inc. ("Coinstar" or the "Company") against its Board of Directors (Arik A. Ahitov, David M. Eskenazy, Robert D. Sznewajs, Ronald B. Woodard, Deborah L. Bevier and Paul D. Davis), one former member of its Board of Directors (Daniel W. O'Connor), and certain top officers (Paul D. Davis, Gregg A. Kaplan, Galen Smith and J. Scott Di Valerio) for breach of fiduciary duty, abuse of control, gross mismanagement and unjust enrichment.[1]

2. Coinstar operates two core businesses: Redbox, which provides self-service digital video disc ("DVD") kiosks for the rental and purchase of DVDs by consumers, and Coinstar coin-counting machines ("Coin Services"), which provide self-service kiosks that enable consumers to convert currency in coins to bills.

3. By late 2010, over 80% of Coinstar's revenue was generated by Redbox. *See* Coinstar 2010 Form 10-K, filed February 10, 2011, at 25 (showing Redbox revenue of $1.16 billion and Coin Services revenue of $276.3 million).

4. It is well known in the movie rental market, and to Coinstar, that movies rent at a substantially higher rate during the first few weeks following their release on the rental market. Thus, it is imperative to Redbox's business model that Redbox kiosks contain a sufficient number of new releases to satisfy customer demand.

5. Before December 1, 2008, movie studios made movies available on physical formats such as DVDs to companies including Redbox 30 to 45 days before releasing those same movies to other distribution channels. Redbox enjoyed a competitive advantage over other companies selling or renting DVDs, because movie studios made new release DVDs available to retailers and Redbox on the same date. Thus, consumers wishing to view a newly released DVD had the option of paying

---

[1] Paul D. Davis is both the Chief Executive Officer of Coinstar and a member of Coinstar's Board of Directors.



ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

full price to purchase a copy of the movie, renting the movie from other retailers that charged more or renting the movie from Redbox for $1.

6. In response to Redbox's success, several major studios began making their movies available for purchase by consumers up to 28 days before making them available for rent. In addition, studios began making movies available for pay-per-view and video on demand at the same time as or before they were available for purchase or rental.

7. In an effort to regain its competitive advantage, Redbox sued three major movie studios, Universal Studios Home Entertainment ("Universal"), Twentieth Century Fox Home Entertainment ("Fox"), and Warner Home Video ("Warner"), seeking to force the studios to allow Redbox to purchase new DVDs for the purpose of renting them to consumers on the same date the DVDs were released by those studios for sale. (This litigation is referred to hereinafter as the "Studios Litigation.") These three studios accounted for 30%-40% of Redbox's DVD supply.

8. In the Studios Litigation complaints, Redbox confirmed the importance to its business model of securing new release DVDs for the rental market. "Over thirty percent of a new-release DVD's revenue is generated during the first two weeks of its release." First Amended Complaint, *Redbox Automated Retail, LLC v. Universal Studios Home Entm't, LLC*, C.A. No. 08-766-RBK (D. Del.) (hereinafter, the "Universal Complaint"), ¶31. "[C]onsumer demand for a new-release DVD is at its highest immediately after its release and declines substantially thereafter and within a short time period." *Id.*, ¶2.

9. Redbox settled its claims with Universal, Fox and Warner. Under the settlements, Redbox would not acquire new release DVDs for 28 days after the studios first released their movies for home viewing through other sources. (These agreements are collectively referred to hereinafter as the "28-Day Delay Agreement.") The settlements were entered into in February and April, 2010.

10. Coinstar downplayed the negative impact that the 28-Day Delay Agreement would have on Redbox. Instead, defendants caused Coinstar to misrepresent that the impact would be, and was, limited to the second quarter of 2010. Thus, even though DVDs from Universal, Fox and



ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

Warner would be available for home viewing through other channels for 28 days before Redbox could make them available, Coinstar claimed that the 28-Day Delay Agreement created a one-time problem.

11. Coinstar's public statements contradicted defendants' private knowledge. As Coinstar stated in ¶31 of the Universal Complaint, "[c]onsumer preference for Redbox rentals can largely be attributed to its ability to conveniently provide consumers with low-cost rentals on the same day that a DVD is released by a studio and made available for home viewing."

12. Analysts credited Coinstar's public statements. In July 2010, a JP Morgan analyst described Coinstar management as "optimistic following the near-term hiccup caused by the 28-day window transition that occurred in April." Coinstar led shareholders to believe that, after the "hiccup," the 28-day delay would not impact revenues. But it did.

13. The impact of the 28-Day Delay Agreement was not limited to the second quarter of 2010. New release rentals from Universal, Fox and Warner would not be available through Redbox for 28 days after release to consumers for home viewing through other channels. Redbox would be forced to fill its kiosks with releases from those studios that, while new to Redbox, had already been available for home viewing for 28 days.

14. Coinstar denied that the 28-Day Delay Agreement would have, and was having, a continuing impact. From July 2010 through January 2011, the Company insisted that the problems caused by the 28-day delay were over.

15. On October 28, 2010, defendants caused Coinstar to significantly raise guidance for the full year 2011 and issued improved guidance for the fourth quarter of 2010. This guidance was provided despite defendants' knowledge that Redbox could not, and would not, meet the inflated numbers. Coinstar's stock price soared by 24%, shooting up to $57.58 per share on October 29, 2010.

16. Coinstar's insiders knew that the 28-Day Delay Agreement would negatively impact revenue. Not only did defendants know that Redbox's competitive advantage was dependent upon

access to new releases, but defendants also received daily results for every Redbox kiosk. Thus, as BTIG research analyst Richard Greenfield analyst stated, "[the Company] made its guidance increase announcement with an entire month's worth of Q4 data on hand. We presume the October data was very encouraging for Redbox to have the confidence to raise guidance." To the contrary, the October 2010 kiosk data confirmed that sales were significantly below the forecasts used to provide guidance to investors.

17. In fact, plaintiffs in the securities fraud litigation consolidated with this case have included in their complaint allegations that a former Chief Accounting Officer at Redbox confirmed that Coinstar insiders tracked Redbox revenue through "daily revenue updates." What's more, the securities complaint alleges that the former Chief Accounting Officer stated that, based on the fact that those daily updates "fell short" of the projections underlying the public guidance, Coinstar internally "reforcasted" downward its revenue and earnings projections for November and December. *See* Consolidated Amended Complaint, *In re Coinstar Inc. Sec. Litig.*, Case No. 2:11-cv-00133-MJP (W.D. Wash.) (Dkt. No. 76).

18. In other words, at the same time that Coinstar issued bullish guidance to the market regarding Redbox's fourth quarter 2010 and full year 2011 revenues, Coinstar insiders knew that sales were significantly below the forecasts underpinning its guidance.

19. On January 13, 2011, Coinstar pre-announced that it would not meet its fourth quarter revenue and earnings projections, stating that revenue would be between $24-$49 million lower than the guidance it issued two months earlier – a miss of up to 11%. It also lowered its full year 2011 guidance by $100 million. Coinstar stock fell 27% on the news, from $56.95 at the close of business on January 13, 2011, to $41.50 at the close of business on January 14, 2011.

20. On February 3, 2011, Coinstar published its actual fourth quarter and full year 2010 financial results. The results were lower than projected in the January 13th guidance, and lower than analysts expected. Defendants attributed the poor performance to, among other things, decreased sales to customers resulting from the 28-Day Delay Agreement. The market reacted by sending

Coinstar's stock still lower, from $44.24 at the close of business on February 3, 2011, to $38.96 at the close of business on February 4, 2011. The stock price had fallen more than 40% from the $66.98 share price on November 24, 2010, a price buoyed by the Company's numerous misrepresentations.

21. Defendants' misrepresentations breached the fiduciary duty of loyalty (and candor and good faith) owed to Coinstar and its shareholders. Moreover, by causing Coinstar to issue false shareholder reports, defendants exposed Coinstar to significant liability for violating the federal securities laws as well as costly and expensive-to-defend securities class action lawsuits.

22. As a result of defendants' breaches of fiduciary duty and violations of law, the Company has been damaged. The Coinstar Board of Directors has not and will not take legal action against themselves or the other persons responsible for the injuries suffered by the Company.

23. Plaintiffs seek recovery for Coinstar against its faithless fiduciaries for the injuries caused by their misconduct.

## JURISDICTION AND VENUE

24. This Court has jurisdiction under 28 U.S.C. §1332(a)(2). Plaintiffs and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

25. This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the district courts permissible under traditional notions of fair play and substantial justice.

26. Venue is proper in this Court under 28 U.S.C. §1391(a) because: (i) Coinstar maintains its principal place of business in this District; (ii) one or more of the defendants either reside(s) in or maintain(s) executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' participation in the



ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

wrongful acts detailed herein, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**PARTIES**

27. Plaintiff MARTA/ATU Local 732 Employees Retirement Plan ("MARTA/ATU Local 732") has been a shareholder of Coinstar continuously since August 2009. MARTA/ATU Local 732 is a citizen of the State of Georgia.

28. Plaintiff Melvin J. Brenner ("Brenner") has been a shareholder of Coinstar continuously since December 2010. Brenner is a citizen of the State of New York.

29. Nominal defendant Coinstar is a Delaware corporation with its principal executive offices located at 1800 114th Avenue South East, Bellevue, Washington. According to its United States Securities and Exchange Commission ("SEC") filings, Coinstar owns and operates approximately 18,900 self-service coin-counting machines in 18,700 locations, which enable customers to convert coins into bills, and approximately 30,200 automated DVD rental kiosks in 26,100 locations. The DVD rental business operates under the name "Redbox." Coinstar is a citizen of the State of Washington.

30. Defendant Arik A. Ahitov ("Ahitov") has been a director of Coinstar since May 2008. Ahitov served as a member of the Audit Committee of the Coinstar Board of Directors ("Audit Committee") during the relevant time period and is a member of the Compensation Committee of the Coinstar Board of Directors ("Compensation Committee"). Ahitov received $191,795 in fees and other compensation during the relevant time period. Ahitov is a citizen of the State of California.

31. Defendant David M. Eskenazy ("Eskenazy") has been a director of Coinstar since August 2000. Eskenazy served as a member of the Audit Committee during the relevant time period. Eskenazy is an "audit committee financial expert" as defined by SEC rules. Eskenazy also serves on the board of directors of MagnaDrive Corporation. Eskenazy received $210,795 in fees

and other compensation during the relevant time period. Eskenazy is a citizen of the State of Washington.

32. Defendant Robert D. Sznewajs ("Sznewajs") has been a director of Coinstar since August 2002. Sznewajs served as a member of the Audit Committee during the relevant time period and is a member of the Coinstar Board of Directors Nominating and Governance Committee ("Nominating and Governance Committee"). Sznewajs is an "audit committee financial expert" as defined by SEC rules. Sznewajs received $196,545 in fees and other compensation during the relevant time period. Sznewajs is a citizen of the State of Oregon.

33. Defendant Ronald B. Woodard ("Woodard") has been a director of Coinstar since August 2001. He is a member of the Coinstar Compensation and Nominating and Governance Committees. Woodard is also the co-founder and Chairman of MagnaDrive Corporation. Woodard received $209,295 in fees and other compensation during the relevant time period. Woodard is a citizen of the State of Washington.

34. Defendant Deborah L. Bevier ("Bevier") has been a director of Coinstar since August 2002. Bevier served as a member of Audit Committee during the relevant time period and is a member of the Compensation Committee. Bevier received $283,899 in fees and other compensation during the relevant time period. Bevier is a citizen of the State of Washington.

35. Defendant Daniel W. O'Connor ("O'Connor") served as a director of Coinstar from February 2009 until March 2011. O'Connor served as a member of the Compensation Committee during the relevant time period. O'Connor received $185,545 in fees and other compensation during the relevant time period. O'Connor is a citizen of the State of Massachusetts.

36. Defendant Paul D. Davis ("Davis") has been Chief Executive Officer and a director of Coinstar since April 1, 2009. Davis previously served as Chief Operating Officer of Coinstar from April 2008 to March 2009. Davis received $2.8 million in salary and incentive-based compensation during the relevant time period. Davis is a citizen of the State of Washington.



ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

37. Defendant Gregg A. Kaplan ("Kaplan") has been President and Chief Operating Officer of Coinstar since April 2009. Kaplan received $3.3 million in salary and incentive-based compensation during the relevant time period. Kaplan is a citizen of the State of Illinois.

38. Defendant Galen Smith ("Smith") has been Corporate Vice President, Finance and Treasurer of Coinstar since January 2010. Previously, Smith served as Director of Corporate Finance of Coinstar from June 2009 through December 2009. Smith is a citizen of the State of Washington.

39. Defendant J. Scott Di Valerio ("Di Valerio") has been Chief Financial Officer of Coinstar since March 2010. Di Valerio received $1.4 million in salary and incentive-based compensation during the relevant time period. Di Valerio is a citizen of the State of Washington.

**THE FIDUCIARY DUTIES OF COINSTAR'S DIRECTORS AND OFFICERS**

40. As directors and officers of Coinstar, defendants owed fiduciary duties to Coinstar – the highest duties known to the law. These fiduciary duties include duties of care and loyalty. Defendants' fiduciary duty of loyalty prohibits them from acting in bad faith as well as from making false statements to Coinstar's shareholders about the Company's business, finances and prospects for future growth.

41. Defendants, because of their positions of control and authority as directors and/or officers of Coinstar, were able to and did, directly and/or indirectly, exercise control over the wrongful acts detailed herein. Because of their executive positions and/or access to Coinstar's internal information, defendants knew or should have known that Coinstar's business was not performing nearly as well as they caused Coinstar to publicly state, and that by making such false statements and omitting adverse, material non-public information, they were not only breaching their fiduciary duty of loyalty owed to Coinstar, but also exposing the Company to damage and injury arising from misleading Coinstar shareholders. Accordingly, defendants are not immune from liability under the business judgment rule and may not be indemnified by the Company for their faithless and unlawful acts.



ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

42. Each of the defendants directly participated in the management of the Company and/or was involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements alleged herein, and/or was aware that these statements were being issued regarding the Company's business operations and approved or ratified these statements. Defendants were provided with copies of Coinstar's SEC reports, earnings releases, conference call remarks, and similar false statements alleged herein prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Defendants were prohibited from engaging in self-dealing as well as unlawful corporate conduct, such as violations of the laws, rules, and regulations applicable to Coinstar and its business.

43. Because of each of the defendants' positions with Coinstar, each knew and had access to non-public information about the ongoing business operations of Coinstar and Redbox, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board of Directors' meetings and committees thereof, and reports and other information provided in connection therewith. Defendants, as corporate fiduciaries entrusted with non-public information, were obligated to disclose material adverse information regarding Coinstar and Redbox, and to abstain from trading on such material adverse information.

44. Because of their positions and access to material non-public information, each of the defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, shareholders and the public, and that the positive representations that were being made were false and misleading. Moreover, because of their positions of control and authority as directors and/or officers of Coinstar, the defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

45. At all relevant times, defendants were the agents of each of the other defendants and were at all times acting within the course and scope of such agency.



ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

46. Pursuant to Coinstar's Code of Conduct, all directors and officers of Coinstar must "provide full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the [SEC] and other regulatory authorities and in other public communications made by the Company. All executives and employees who are involved in Coinstar's disclosure process are responsible for acting in furtherance of this policy."

47. Additionally, Coinstar's Code of Conduct states that "[i]t is against Company policy for any individual to profit from material undisclosed information relating to the Company or any company with which the Company does business. If an employee is in possession of material inside information that the Company has not yet disclosed to the public, he or she may not purchase or sell any of the securities of the Company or 'tip' others to trade in Company stock."

48. Under the Audit Committee Charter, the members of the Audit Committee are required, among other things, to: (a) review and discuss with management the Company's annual and quarterly financial statements; (b) review annual and quarterly earnings press releases in advance of their issuance; (c) discuss or review financial information and earnings guidance provided to Coinstar shareholders, securities analysts and members of the financial press; (d) review any reports by management regarding the effectiveness of, or any deficiencies in, the design or operation of disclosure controls and procedures or internal controls, and any fraud, whether or not material, that involves management or other employees who have a significant role in Coinstar's internal controls; (e) discuss policies with respect to risk assessment and risk management, including the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures; (f) monitor compliance with the Company's Code of Ethics by Coinstar's senior financial officers; and (g) monitor compliance with Coinstar's Code of Conduct by all Coinstar directors, officers and employees.

49. The members of the Audit Committee (defendants Ahitov, Bevier, Eskenazy and Sznewajs) failed to discharge their fiduciary duties and obligations under the Audit Committee Charter.



ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

## AIDING AND ABETTING, AND CONCERTED ACTION

50. In committing the wrongful acts particularized herein, defendants have pursued or joined in the pursuit of a common course of conduct, and have acted in concert with one another in furtherance of their common plan or design. In addition to the wrongful conduct particularized herein as giving rise to primary liability, defendants further aided and abetted and/or assisted each other in breach of their respective fiduciary duties and obligations under the law.

51. Each of the defendants aided and abetted, and rendered substantial assistance, in the wrongs detailed herein. In taking such actions to substantially assist the commission of the wrongdoing detailed herein, each defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

**Background**

52. Redbox Automated Retail LLC was developed by McDonald's Ventures, LLC. In or around July 2002, Coinstar purchased a 47% interest in Redbox. Coinstar purchased the remaining 53% interest in Redbox in February 2009. Coinstar operates Redbox as a wholly-owned subsidiary, and Redbox provides over 80% of Coinstar's revenue.

53. Historically, Redbox was able to purchase new release DVDs. Thus, Redbox stocked its kiosks with new release DVDs on the same date that the new releases became available to consumers. In December 2008, distributors no longer provided Redbox with new releases from Universal, Fox or Warner on the dates that they first made those releases available to consumers.

54. After trying to acquire new releases on the day of their release through other means, including by purchasing them at retail stores, Redbox sued Universal, Fox and Warner. Redbox argued that these studios were illegally impinging on its ability to provide a "low-cost, highly convenient" manner in which to rent or purchase new release DVDs. Among others, Redbox asserted claims for copyright misuse, tortuous interference and antitrust violations.



ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

55. As one of the complaints stated, Redbox knew that consumers preferred low-cost rentals made available "on the same day that a DVD is released by a studio and made available for home viewing." "Over thirty percent of a new-release DVD's revenue is generated during the first two weeks of its release." In other words, "consumer demand for a new-release DVD is at its highest immediately after its release and declines substantially thereafter and within a short time period."

56. In the Studios Litigation, Universal's motion to dismiss was granted as to the copyright misuse and tortuous interference claims, and denied as to the antitrust claim. After that decision, and after Fox and Warner filed motions to dismiss the claims that Redbox made against them, Redbox agreed to settlements dismissing the litigation against all three studios. Those settlements comprise the 28-Day Delay Agreement. Redbox announced the settlements on February 16 and April 22, 2010.

57. Pursuant to the 28-Day Delay Agreement, Redbox could procure new releases from Universal, Fox and Warner, but not until 28 days after the earliest date on which those movies would first be made available to the public.

58. Moreover, before the 28-Day Delay Agreement, Redbox could sell old DVDs for approximately $7 apiece. However, under the 28-Day Delay Agreement Redbox was prohibited from reselling these studios' DVDs after their useful rental life, resulting in zero salvage value to Redbox.

**Coinstar's First Quarter 2010 Financial Results and Projections**

59. On April 29, 2010, Coinstar announced its financial results for the first quarter of 2010, which ended March 30, 2010. In a press release reviewed and approved by defendants immediately before or after April 29, 2010, Coinstar reported income of $6.4 million, or $0.21 per share, and revenue of $350.1 million. Additionally, the Company updated revenue guidance for the full year 2010 to a range of $1.53 billion to $1.63 billion, and revenue guidance for the second



ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

quarter of 2010 to $370 million to $390 million. More particularly, the earnings release authorized by defendants stated:

> "We are very pleased with our outstanding first quarter results that underscore the strength in our DVD and Coin businesses," said Paul Davis, chief executive officer of Coinstar, Inc. "We have made significant progress in strengthening and enhancing our relationships with retailers and suppliers, and extending our value proposition to existing and new consumers. Our achievements give us confidence that we have the right strategy in place to lead in automated retail."
>
> * * *
>
> "Solid execution in our core businesses drove our strong financial results across the board," said J. Scott Di Valerio, chief financial officer of Coinstar, Inc. "We invested in the business to support our growth initiatives and at the same time generated $33 million in free cash flow, a substantial increase over last year. The traction we gained in the first quarter indicates we are well-positioned for continued success in our DVD business, renewed growth in Coin and increased profitability."

60. After releasing its first quarter 2010 financial results on April 29, 2010, defendants caused Coinstar to host a conference call for Coinstar shareholders, investors, media representatives and securities analysts. During the conference call, on behalf of all defendants, defendants Davis and Di Valerio misrepresented the following:

> [DAVIS:] Coinstar's vision is to become the leader in automated retail. Based on our first quarter performance, we are making terrific progress in executing on the plans we laid out on our last earnings call in February.
>
> * * *
>
> With the Redbox business, we have also made great strides with partners. As we announced last Thursday, we have signed agreements with Universal Studios and 20th Century Fox, and have dismissed our lawsuits against both of them. The agreements enable us to secure new release DVD titles directly from Universal and Fox in sufficient quantities 28 days after street date to meet consumer demand and protect our value pricing. At the same time, the agreements include substantially lower product costs that will benefit our margins. With these agreements and the one with Warner Brothers that we announced in February, we have now stabilized our supply chain and eliminated the workarounds we had in place.
>
> * * *
>
> [Di VALERIO:] Certainly had a great start to 2010, and are continuing to drive the business and focus on our three core fundamentals. During the first quarter, we saw positive trends in both the coin and DVD businesses, and the performances translated into very strong financial results that reflect higher revenue than expected, disciplined spending and increased leverage in the business.



ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

61. On this news, the trading price of Coinstar shares increased by $6.15 per share to $44.36 per share on April 30, 2010. In turn, Coinstar's shareholders' equity increased more than $190.6 million.

62. On May 26, 2010, defendants caused Coinstar to update its second quarter and full year 2010 guidance, reporting second quarter 2010 revenue expectations in the range of $363 million to $383 million, and full year 2010 revenue expectations in the range of $1.50 billion to $1.59 billion.

**Coinstar's Fraudulent Second Quarter Financial Results and Projections**

63. On July 29, 2010, defendants caused Coinstar to announce its financial results for the second quarter of 2010, which ended June 30, 2010. In a press release reviewed and approved by defendants immediately before or after July 29, 2010, Coinstar reported income of $29.3 million, or $0.39 per share, and revenue of $342 million for the second quarter of 2010. Defendants also caused Coinstar to raise its third quarter revenue guidance to between $370 million and $390 million and its full year 2010 revenue guidance to between $1.42 billion and $1.5 billion (after adjusting for reclassification of Money Transfer as discontinued operations). More particularly, the earnings release authorized by defendants stated:

> "We are very pleased with our second quarter results and the performance of our core businesses," said Paul Davis, chief executive officer of Coinstar, Inc. "We continue to have great momentum in our DVD business as demonstrated by our increasing market share and expanding relationships with key partners. Our Coin business is showing impressive growth in same store sales, and our outlook for the remainder of 2010 is positive as we continue to execute on our automated retail strategy."

64. After releasing its second quarter 2010 financial results on July 29, 2010, defendants caused Coinstar to host a conference call for Coinstar shareholders, investors, media representatives, and securities analysts. During the conference call, on behalf of all defendants, defendants Davis and Di Valerio misrepresented the following:

> [DAVIS:] As we discussed on our April call, the second quarter marked a transition period for us as a 28-day window became fully implemented with three studios. We did a good job of estimating the impact of revenue and operating

income of both the transition period and the 28-day window. We continue to refine our buying, marketing and overall processes as we gather more data.

* * *

As demonstrated by recent customer wins, there is plenty of opportunity for Redbox expansion in new locations, and the success of our dual strategy further enhances our growth on the top and bottom line. In addition to the work we have been doing to revitalize our Coin business, it's showing progress with positive sales comps, revenue and margin growth. With a clear focus on execution in key business areas, we have been able to deliver strong operating results, build a road map for long-term growth, and deepen our relationships with our partners. I am very pleased with our second quarter results and with how the rest of the year is shaping up. I will now turn the call over to Scott for more detail on our financial and business performance in the second quarter.

. . . [Di VALERIO:] Our second quarter was another quarter in which we delivered strong operating results, extended our partner relationships, and enabled the Company to deliver on its promise of focusing on the core business.

* * *

Moving to the highlights of the quarter, . . . revenue grew 35% driven primarily by an increase in the number of Redbox kiosks and rentals as well as strong performance in our Coin business. Adjusted EBITDA from continuing operations grew 31%, impacted by the transition to the 28-day window for Warner Bros., Universal and Fox. Our strong business execution delivered 11% growth in diluted earnings per share from continuing operations to $0.39 cents and free cash flow of $51.8 million.

* * *

The new variable of the delayed titles add a complexity to this estimate, especially since in Q2, we are at one-third of our DVD and kiosks were 28-day delay titles. We are confident we will continue to get better at determining the optimum inventory levels as we move through the next several quarters.

65. These statements misled Coinstar shareholders as to the effect of the 28-Day Delay Agreement. Specifically, defendants highlighted the passing of a "transition period" under the Agreement, suggesting that its negative effects had run their course. The "transition period," however, was the new normal, and would remain so as long as the 28-Day Delay Agreement kept Redbox from making available new releases from Universal, Fox and Warner on the date that those releases were first released to consumers.

**Coinstar's Fraudulent Third Quarter Financial Results and Projections**

66. On October 28, 2010, defendants caused Coinstar to announce its financial results for the third quarter of 2010, ended September 30, 2010. In a press release reviewed and approved by defendants immediately before or after October 28, 2010, Coinstar reported income of $46.2 million or $0.66 per share, and increased revenue of $380 million. Defendants also caused Coinstar to revise its full year 2010 revenue guidance to $1.46 billion and $1.48 billion and its fourth quarter 2010 guidance to between $415 million and $440 million. More particularly, the earnings release authorized by defendants stated:

> "Coinstar's exceptional third quarter performance demonstrates the strength of our leading Coin and DVD businesses, and our ability to execute, drive operational efficiencies and deliver what our consumers want," said Paul Davis, chief executive officer of Coinstar, Inc. "We are confident in our growth prospects and believe we are in a great position to continue creating value through our automated retail strategy."
>
> * * *
>
> "Focus on our consumers, our partners and growing profitably continued to drive strong growth at the top and bottom line," said J. Scott Di Valerio, chief financial officer of Coinstar, Inc. "Our solid financial and operating performance enables us to invest for the future and focus on returns for our shareholders. Looking to 2011, we are excited about the opportunities ahead across our businesses."

67. After releasing its third quarter 2010 financial results on October 28, 2010, defendants caused Coinstar to host a conference call for Coinstar shareholders, investors, media representatives and securities analysts. During the conference call, on behalf of all defendants, defendants Davis and Di Valerio misrepresented the following:

> [DAVIS:] I'm very pleased with our results in the third quarter. We drove strong growth at the top and bottom line, as we continued to focus on the three key areas that drive our performance. As you can see on slide three, they are delighting and engaging consumers, strengthening our partner relationships and generating profitable growth.
>
> I'd like to highlight our progress in these areas, starting with delighting and engaging consumers. I'll start with redbox, which had a great quarter, with revenue up over 50%. This was driven in part by same-store sales growth of 17.2%, as well as overall growth in the DVD business.
>
> * * *



ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

> [Di VALERIO:] Moving to highlights for this quarter, . . . revenue grew 42% year-over-year, driven by strength in both our redbox and Coin segments. Solid execution drove 48% growth in adjusted EBITDA from continuing operations and 74% growth in diluted earnings per share from continuing operations.
>
> * * *
>
> So, . . . for the full year 2010, we expect consolidated revenue between $1.46 billion and $1.485 billion, narrowed from the previous range of $1.425 billion to $1.505 billion. EBITDA is expected to be between $291 million and $297 million, up from $275 million to $290 million. We expect GAAP EPS from continuing operations between $2.14 and $2.20 on a fully-diluted basis, up from $1.88 to $2.00, and net redbox kiosk installs of 8,300 to 8,500. This results in 7,500 to 7,700 net DVD kiosk installs following the removal of 800 DVD Express kiosks. CapEx from continuing operations will be in the range of $179 million to $188 million, and free cash flow from continuing operations will range between $100 million and $110 million, up from $80 million to $100 million.
>
> Our guidance for the full year implies the following for our fourth quarter of 2010. We expect consolidated revenue between $415 million and $440 million. EBITDA is expected to be between $84 million and $90 million, and GAAP EPS from continuing operations between $0.79 and $0.85 on a fully-diluted basis.

68. These results were misleading. The improved third quarter results did not mean, as defendants suggested, that the 28-Day Delay Agreement "transition period" had ended. Rather, it had to do with two factors that the Company did not discuss.

69. First, the improved results were driven by the increase in movie rentals that always occurs during summer months. As the Company states in its third quarter 2010 Form 10-Q, summer months historically represent among the "highest rental months for DVD Services."

70. Second, as plaintiffs in the securities fraud class action point out, due to circumstances over which Redbox had no control, the movies that became available during the summer months were disproportionately from studios other than Universal, Fox and Warner, and therefore not subject to the 28-day delay. For July and August, less than 20% of the new releases were covered by the 28-Day Delay Agreement, despite the fact that, on average, 30%-40% of new releases would usually be subject to the 28-day delay.

71. Thus, Coinstar met its third quarter guidance because of seasonality and luck; not, as defendants averred, because the effects of the 28-Day Delay Agreement had ceased.



ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

72. Fueled by defendant's misstatements and omissions, however, the media, analysts and shareholders believed otherwise. In the wake of Coinstar's third quarter 2010 earnings announcement, on October 28, 2010, *Bloomberg* reported:

> Coinstar Inc., owner of the Redbox movie-rental kiosks, reported third-quarter profit that beat analysts' estimates as DVD revenue surged. The shares rose after the company's 2011 profit forecast also topped projections.
>
> Profit from continuing operation rose to $21.4 million, or 66 cents a share, from $11.6 million, or 38 cents, a year earlier. Coinstar said today in a statement. Profit beat the 50- cent average of seven analysts' estimates compiled by Bloomberg.
>
> The company, along with Netflix Inc., will continue to profit from physical rentals of DVDs because they offer consumers better value than video-on-demand or rentals available through cable or satellite services, said Michael Pachter, an analyst at Wedbush Securities in Los Angeles who has an "outperform" rating on Coinstar's shares, The company plans to expand into online service next year.
>
> "It's them and Netflix; they're going to divide the world," Pachter said in an interview. "Because Coinstar offers lower rental costs than VOD at slightly less convenience, there's a lot of room for these guys to grow."
>
> Sales rose 42 percent to $380.2 million, the Bellevue, Washington-based company said, shy of the $381.8 million average of 12 estimates. DVD revenue jumped 54 percent.
>
> Coinstar rose $6.45, or 14 percent, to $52.71 in extended trading after the results came out. The stock gained 66 cents to $46.26 at 4 p.m. New York time in Nasdaq Stock Market trading and has advanced 67 percent this year.
>
> **Taking Customers**
>
> Coinstar, with about 28,500 DVD kiosks, is picking up customers as Blockbuster Inc. and Movie Gallery close stores. Movie Gallery, based in Dothan, Alabama, filed for bankruptcy protection in February and is liquidating. Blockbuster, the largest movie-rental chain, also declared bankruptcy and is closing some outlets as it seeks to restructure its debts.
>
> This quarter, Coinstar forecasts revenue will rise to between $415 million and $440 million and earnings will increase to 79 cents to 85 cents a share. Analysts were projecting 77 cents on sales of $422.5 million, the average of eight estimates compiled by Bloomberg.
>
> In a filing, Coinstar projected 2011 profit of $3 to $3.50 a share from continuing operations on revenue of $1.8 billion to $1.95 billion. On that basis, the company was expected by analysts to earn $2.93 a share on sales of $1.8 billion, the average of 10 analysts' estimates compiled by Bloomberg.

73. Similarly, on November 10, 2010, *Forbes.com* reported:



ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

> Coinstar, best known for its coin-counting kiosks in many convenience and grocery stores, is coming off of its seventh consecutive earnings surprise, which sent shares to all-time highs.
>
> The continual earnings boosts are in part due to the company's ownership of the increasingly popular redbox kiosks, a self-service DVD vendor. There are now roughly 40,000 redbox kiosks under Coinstar's management nationwide.
>
> While the valuations look high initially, with earnings expected to more than triple investors do not mind paying a premium.
>
> Coinstar said its top line grew 42%, to $380 million, during the third quarter, which was announced on Oct 28. The cash cow remains to be the DVD revenue, rising over 54% to $306 million.
>
> Investors were more than happy with earnings per share corning in 15 cents higher than expected, at 66 cents. This was Coinstar's seventh consecutive earnings surprise.
>
> **Estimates Climbing**
>
> CEO Paul Davis described the results as exceptional and went on to raise guidance, which spurred analysts to do the same.
>
> After 8 upward revisions the Zacks Consensus Estimate for fiscal 2010 is up 24 cents, to $2.19. Next year's projections are up 52 cents on average, to $3.32.
>
> Given these targets, earnings are expected to more than triple by the end of 2011, given the $1.06 earned in 2009.
>
> **Valuations**
>
> Shares of CSTR are not quite the bargain that the DVD rentals are, but at 19 times the 2011 estimates and with a PEG of 1.4, it is not overpriced either.
>
> In fact, these valuations are lower than the historic averages for CSTR. Also, as long as the growth story keeps improving, investors have not trouble buy up shares.
>
> Following the earnings release, the stock quickly jumped to an all- time high after the news. CSTR is taking a breather right now, but as investors get used to the higher price, it should continue higher.

74. On November 17, 2010, Coinstar participated in the Morgan Stanley TMT Conference. During the conference, defendant Davis, on behalf of defendants, misrepresented the following:

> At the end of this year we will have 30,000 kiosks in 26,000 locations. And just in the last few years, literally, beginning five years ago, Redbox was $40 million and at the end of this year we will be close to $1.2 billion. So we have had



ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

> significant growth with that business and if you're not familiar with the Redbox business, the consumer proposition is at $1.00 a night. You rent anywhere and then drop anywhere, and there are no late fees, no subscription.
>
> * * *
>
> So, we continue to grow. We look at the viable universe, in the States we'd say that there are between 45,000 and 60,000 locations. That's not [to] be misconstrued with kiosks, because in our mix this year we will have – at the end of this year we'll have approximately 4,000 duals or two machines at a single location. So given our convenience, ubiquitous presence, coupled with a great value, and then our presence in the social media space it has positioned us to really do a great job and pick up a lot of share in this market.
>
> * * *
>
> Given our footprint – and we will continue to add lots of kiosks. As we speak we are adding about one kiosk per hour, 24 hours a day, seven days a week. Last year it was around 9,000 and it will be in that number, north of 8,000, this year.
>
> So as we become easier and easier to use, just given the ubiquitous footprint, we think we are well positioned to gain share.

75. Contrary to defendants' misrepresentations, however, Coinstar's business was performing poorly. In fact, during the relevant time period: (i) Coinstar's revenues were significantly and adversely impacted by the agreement it had with several movie studios to delay new release availability in its kiosks by 28 days; (ii) under defendants' direction, Coinstar was not able to properly and effectively manage its inventory; (iii) Coinstar was not operating according to plan; (iv) Coinstar lacked adequate internal controls; (v) as a result of the foregoing, Coinstar's financial statements were materially false and misleading; and (vi) defendants lacked any reasonable basis for their positive statements about Coinstar and its financial prospects. Moreover, defendants knew that their statements were false.

76. Plaintiffs in the securities fraud class action aver that Redbox's then-Chief Accounting Officer stated that not only did defendants not have reason to believe their statements, but that defendants knew the statements to be false. According to the securities fraud class action complaint, the Chief Accounting Officer stated that Coinstar reforecasted down internally its projections for November and December 2010 based on what it knew to be a poor performance in October 2010, while at the same time issuing positive, albeit false, guidance to the market.



ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

**Defendants' Misconduct Is Revealed**

77. Defendants' unlawful scheme to misrepresent the success of Coinstar's business continued until January 2011. Then, on January 13, 2011, defendants caused Coinstar to report its preliminary financial results for the fourth quarter of 2010, ended December 31, 2010. In a press release reviewed and approved by defendants immediately before or after January 13, 2011, Coinstar reported lowered guidance for sales and profit, cutting its fourth quarter fiscal year 2010 sales forecast to $391 million from its previous outlook of $440 million. The Company also lowered guidance on EPS, to a range of $0.65 to $0.69 per share, compared to the previously announced range of $0.79 to $0.85 per share.

78. Coinstar also reported its revised outlook for 2011, with revenue between $1.7 billion and $1.8 billion. More particularly, the earnings release authorized by defendants stated:

> "Overall, the performance of the *redbox* business during the fourth quarter was not in line with our forecast. This was *redbox*'s first holiday season with 28-day delayed titles, and we underestimated the impact that the delay would have on demand during the fourth quarter. We also expected much better performance from Blu-ray and had purchased to a higher level of demand. While consumer visits to the kiosks remained strong, the number of movies per visit, or basket size, was lower than planned. We have already taken a number of decisive steps to better align content purchases with our consumers' behavior, including offering more day and date titles and better allocating Blu-ray titles to high demand areas. In addition, since inventory migration reflects the popularity of our rent and return anywhere capability, we have made adjustments in our field processes to minimize the impact of higher levels of migration on overall rentals."

79. On this news, the trading price of Coinstar stock collapsed by $15.45 per share to $41.50 per share on January 14, 2011, instantly wiping out more than $478 million in shareholders' equity.

80. Shortly thereafter, on February 3, 2011, defendants caused Coinstar to announce its actual fourth quarter and year end 2010 financial results. In a press release reviewed and approved by defendants immediately before or after February 3, 2011, Coinstar reported income of $43.2 million, or $0.68 diluted EPS, and revenue of $390.8 million for the fourth quarter of 2010. The Company further announced its guidance for the first quarter and full year 2011, expecting net

income between $325 million and $355 million, or between $2.50 and $3.10 diluted EPS, and revenue between $1.70 billion and $1.85 billion.

81. More particularly, the earnings release authorized by defendants stated:

> "We grew our fourth quarter revenue 31% over the prior year, and while this was not in line with our expectations, we still delivered $2.03 in earnings per share for the full year," said Paul Davis, chief executive officer of Coinstar, Inc. "We have taken definitive steps to correct the issues we encountered with our redbox business in the fourth quarter and will be tracking progress closely. Our coin business remains solid with same store sales growth of approximately 10% and redbox increased its unit market share to 29.8%. We remain optimistic about our core businesses as well as future opportunities with new automated retail concepts and we are committed to driving continued profitable growth."

82. On this news, the trading price of Coinstar stock collapsed again, falling an additional $5.28 per share to $38.96 per share on February 4, 2011, and wiping out an additional $163.6 million in valuable shareholders' equity.

83. As a result of defendants' false statements, Coinstar has been severely injured and damaged. Hundreds of millions of dollars in shareholders' equity has been wiped out. Worse yet, the Company has been exposed to the risk of massive liability for violating the federal securities laws. Indeed, Coinstar already has been named as a defendant in a costly and expensive-to-defend securities class action lawsuit.

**DEFENDANTS' UNLAWFUL INSIDER SELLING**

84. During the relevant time period, defendants Ahitov, Eskenazy, Sznewajs, Woodard, Davis and O'Connor, six of the seven members of the Board of Directors at the time, capitalized on their knowledge of the false statements by selling $3.12 million worth of their personal Coinstar shares without first disclosing the true condition and status of Coinstar's business and finances. By engaging in insider trading, these defendants breached their fiduciary duty of loyalty to Coinstar. Defendants' illicit stock sales are detailed below:



ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

| Date | Insider Selling Defendant | Number of Shares | Price Per Share | Gross Proceeds |
|---|---|---|---|---|
| 11/2/10 | Ahitov | 6,529 | $58.35 | $380,967 |
| 11/2/10 | Davis | 17,019 | $58.00 | $987,102 |
| 11/8/10 | Woodard | 12,500 | $61.56 | $769,500 |
| 11/9/10 | Eskenazy | 2,000 | $61.05 | $122,100 |
| 11/9/10 | Sznewajs | 2,300 | $61.75 | $142,025 |
| 11/10/10 | Sznewajs | 600 | $60.10 | $36,060 |
| 11/10/10 | Eskenazy | 500 | $61,50 | $30,750 |
| 11/11/10 | Eskenazy | 3,033 | $62.36 | $189,138 |
| 11/12/10 | Eskenazy | 3,500 | $63.29 | $221,515 |
| 11/23/10 | O'Connor | 1,817 | $62.25 | $113,108 |
| 11/23/10 | O'Connor | 2,083 | $62.79 | $130,792 |
| **Total** | | **51,881** | | **$3,123,057** |

## DAMAGE TO COINSTAR

85. Defendants caused Coinstar to engage in a course of conduct which was designed to and did artificially inflate the trading price of Coinstar's shares, and deceive shareholders regarding the success of Coinstar's business and the impact of the 28-Day Delay Agreement on Coinstar's earnings and prospects for future earnings growth. Defendants undertook this scheme to prolong the appearance of good fortune at Coinstar, profit personally by trading while in possession of material, non-public information concerning the true financial condition of the Company, and maximize the value of their personal stock holdings.

86. As a direct result of defendants' unlawful course of conduct, Coinstar and several of its officers and executives are now defendants in numerous federal securities class action lawsuits for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5. *See In re Coinstar, Inc. Sec. Litig.*, Case No. 2:11-cv-00133 MJP (W.D. Wash).

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

87. Plaintiffs incorporate ¶¶1-86.

88. Plaintiffs bring this action derivatively on behalf of Coinstar to redress injuries suffered and to be suffered by Coinstar as a proximate result of defendants' breaches of fiduciary

duty, abuse of control, gross mismanagement and unjust enrichment. Plaintiffs will adequately represent the interests of Coinstar in the derivative claims asserted in this action.

89. As particularized above, defendants breached their fiduciary duty of loyalty (and candor and good faith) and engaged in unlawful conduct. Accordingly, a pre-suit demand on the Coinstar Board of Directors to commence, let alone vigorously prosecute, this action is a useless and futile act, and therefore excused.

90. First, the members of Coinstar's Board of Directors have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the corporation for the violations of law complained of herein. These are people they have developed professional relationships with, who are their friends and with whom they have entangled financial alliances, interests and dependencies. Therefore, the Board is not able to and will not vigorously prosecute any such action.

91. Second, the Coinstar Board of Directors participated in, approved and/or permitted the wrongs alleged herein to have occurred, and participated in efforts to conceal or disguise those wrongs from Coinstar's shareholders, or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties. As a result of their access to and review of internal corporate documents, or conversations and connections with other corporate officers, employees, and directors and attendance at management and/or Board of Directors' meetings, each of the defendants knew the adverse non-public information regarding Coinstar's business and financial condition. Pursuant to their specific duties as Board members, the members of the Coinstar Board of Directors are charged with managing the Company and conducting its business affairs. Defendants breached the fiduciary duty of loyalty (and candor and good faith) owed to Coinstar and its shareholders in that they caused false and misleading statements about Coinstar's revenues, income and earnings to be made to Coinstar shareholders. The Coinstar Board of Directors cannot exercise independent objective judgment in deciding whether to bring this action



ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

or whether to vigorously prosecute this action, because each of its members participated personally in the wrongdoing or are dependent upon other defendants who did.

92. Third, the acts complained of constitute violations of the fiduciary duty of loyalty (and candor and good faith) owed by Coinstar's directors and these acts are incapable of ratification.

93. Fourth, the members of Coinstar's Board of Directors have benefited, and will continue to benefit, from the wrongdoing herein alleged; have engaged in such conduct to preserve their positions of control and the perquisites derived thereof; and are incapable of exercising independent objective judgment in deciding whether to bring this action.

94. Fifth, any suit by the directors of Coinstar to remedy these wrongs would likely further expose defendants to liability under the federal securities laws, which could result in additional civil and/or criminal actions being filed against one or more of the defendants. Thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

95. Sixth, Coinstar has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Coinstar Board of Directors has not filed any lawsuits against defendants or others who were responsible for that wrongful conduct to attempt to recover for Coinstar any part of the damages Coinstar suffered and will suffer thereby.

96. Seventh, the Coinstar Board of Directors is required to comply with the Company's Code of Conduct. The Code of Conduct requires all disclosures to be "full, fair, accurate, timely and understandable." Further, the Code of Conduct expressly prohibits improper insider stock sales. Each member of the Board of Directors permitted the false and misleading statements particularized herein to be disseminated. Additionally, defendants Ahitov, Davis, Eskenazy, Sznewajs and Woodard violated the Code of Conduct by engaging in unlawful insider selling of their personal Coinstar shares. Therefore, the entire Coinstar Board of Directors faces a substantial likelihood of liability for their breaches of fiduciary duty of loyalty (and candor and good faith), and any demand upon them is futile.



ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

97. Eighth, while in possession of adverse, material non-public information regarding Coinstar's business and finances, defendants Ahitov, Davis, Eskenazy, Sznewajs and Woodard sold their personal Coinstar shares for $2.88 million in unlawful insider trading proceeds. These defendants profited from the misconduct particularized herein. Consequently, they are not disinterested in the outcome of this litigation, and a pre-suit demand is excused.

98. Ninth, during the relevant time period, defendants Ahitov, Bevier, Eskenazy and Sznewajs served as members of the Audit Committee. Under the Audit Committee Charter, the members of the Audit Committee were and are responsible for, among other things, reviewing the adequacy of Coinstar's internal controls, reviewing the integrity of Coinstar's financial statements, and reviewing Coinstar's earnings press releases and guidance. Additionally, under the Audit Committee Charter, the members of the Audit Committee are charged with monitoring director and officer compliance with Coinstar's Code of Conduct, which expressly prohibits improper insider trading by all directors and officers of Coinstar. Here, defendants Ahitov, Bevier, Eskenazy and Sznewajs breached their fiduciary duties because the Audit Committee, along with the entire Coinstar Board of Directors, caused false and misleading statements to be made to Coinstar shareholders in the Company's reports, and failed to ensure that adequate internal controls were in place. As a result, defendants Ahitov, Bevier, Eskenazy and Sznewajs are not disinterested and face a substantial likelihood of liability, which renders a pre-suit demand upon them futile.

99. Tenth, demand is excused because the conduct alleged herein, including the issuance of false and misleading statements to shareholders, was not the product of a valid exercise of business judgment. The conduct of the director/defendants alleged herein, including the issuance of false and misleading statements to shareholders, was so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability for breach of fiduciary duty therefore exists.

100. Eleventh, defendant Davis is employed full-time by the Company, and has received and continues to receive substantial monetary compensation as a result of that employment as set



ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

forth below. Defendant Davis will act to preserve and not threaten his position of control and the perquisites thereof, and is therefore incapable of exercising independent objective judgment in deciding whether to bring this action.

**COUNT I**

**(Breach of Fiduciary Duty Against Defendants)**

101. Plaintiffs incorporate ¶¶1-100.

102. Defendants owe Coinstar and its shareholders fiduciary duties, including the fiduciary duty of loyalty (and candor and good faith).

103. Defendants have violated their fiduciary duties, including their fiduciary duty of loyalty (candor and good faith). More specifically, defendants, in breach of their fiduciary duties, made false statements and omitted to disclose adverse, material non-public information regarding the Company's revenues, earnings and operations in Coinstar's shareholder reports.

104. By reason of the foregoing acts, practices and course of conduct, defendants have failed to faithfully discharge their fiduciary duties owed to Coinstar and its shareholders.

105. As a proximate result of defendants' misconduct, Coinstar has been injured and is entitled to damages.

**COUNT II**

**(Abuse of Control Against Defendants)**

106. Plaintiffs incorporate ¶¶1-105.

107. At all relevant times, defendants employed an unlawful scheme for the purpose of maintaining and entrenching themselves in their positions of control, power, prestige and profit at Coinstar. As a part of this scheme, defendants made and/or participated in the making of misrepresentations regarding Coinstar's business and financial condition.

108. Defendants' conduct constituted an abuse of their ability to control and influence Coinstar.



ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

109. As a proximate result of defendants' misconduct, Coinstar has been injured and is entitled to damages.

**COUNT III**

**(Gross Mismanagement Against Defendants)**

110. Plaintiffs incorporate ¶¶1-109.

111. Defendants owed Coinstar and its shareholders a fiduciary duty to competently and lawfully direct its business and affairs. In derogation of that fiduciary duty, defendants grossly mismanaged Coinstar by causing it to issue false and misleading statements about the Company's business and financial condition to shareholders and the public alike. As a result, Coinstar now faces potentially massive liability for violations of the federal securities laws. Indeed, the Company already has been named as a defendant in costly and expensive-to-defend class action lawsuits.

112. As a proximate result of defendants' misconduct, Coinstar has been injured and is entitled to damages.

**COUNT IV**

**(Unjust Enrichment Against Defendants)**

113. Plaintiffs incorporate ¶¶1-112.

114. As a result of the misconduct particularized herein, defendants have been unjustly enriched at the expense of Coinstar, in the form of unjustified salaries, benefits, bonuses and other emoluments of office.

115. All the payments and benefits provided to defendants were at the expense of Coinstar. The Company received no benefit from these payments.

116. As a proximate result of defendants' misconduct, Coinstar has been injured and is entitled to damages.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs demand judgment as follows:



ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900, San Diego, California 92101
Telephone: 619/231-1058 • Fax: 619/231-7423

A. Awarding money damages against all defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, to ensure that defendants do not participate therein or benefit thereby;

B. Directing all defendants to account for all damages caused by them and all profits, special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees and insider sales proceeds, and imposing a constructive trust thereon;

C. Directing Coinstar to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with applicable law, including, but not limited to, the federal securities laws and state corporation laws regarding fiduciary duties;

D. Awarding punitive damages;

E. Awarding costs and disbursements of this action, including reasonable attorneys', accountants' and experts' fees; and

F. Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

DATED: July 15, 2011

ROBBINS GELLER RUDMAN
& DOWD LLP
DARREN J. ROBBINS
TRAVIS E. DOWNS III
BENNY C. GOODMAN III

s/ TRAVIS E. DOWNS III
TRAVIS E. DOWNS III

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
Email: darrenr@rgrdlaw.com
Email: travisd@rgrdlaw.com
Email: bennyg@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
MATTHEW S. MELAMED
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
Email: mmelamed@rgrdlaw.com

Lead Counsel for Plaintiffs

LAW OFFICES OF TAMARA J. DRISCOLL
TAMARA J. DRISCOLL (WSBA #29212)
321 North 80th Street
Seattle, WA 98103
Telephone: 206/724-5362
Email: tamaradriscoll@alumni.nd.edu

Liaison Counsel

JACOBS & SLAWSKY, P.A.
NORMAN J. SLAWSKY
315 W. Ponce de Leon Avenue, Suite 859
Decatur, GA 30030
Telephone: 404/378-1711
404/377-1711 (fax)
Email: nslawsky@gmail.com

TERRELL MARSHALL DAUDT
& WILLIE PLLC
BETH E. TERRELL (WSBA #26759)
JENNIFER RUST MURRAY (WSBA #36983)
936 North 34th Street, Suite 400
Seattle, WA 98103
Email: bterrell@tmdwlaw.com
Email: jmurray@tmdwlaw.com

SCHUBERT JONCKHEER & KOLBE LLP
ROBERT C. SCHUBERT
WILLEM F. JONCKHEER
DUSTIN L. SCHUBERT
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
Telephone: 415/788-4220
415/788-0161 (fax)
Email: rschubert@schubertlawfirm.com
Email: wjonckheer@schubertlawfirm.com
Email: dschubert@schubertlawfirm.com

Additional Counsel for Plaintiffs

# VERIFICATION

I, TRAVIS E. DOWNS III, hereby declare as follows:

1. I am a member of the law firm of Robbins Geller Rudman & Dowd LLP, Lead Counsel for plaintiffs MARTA/ATU Local 732 Employees Retirement Plan and Melvin J. Brenner in the above-entitled action. I have read the foregoing complaint and know the contents thereof. I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2. I make this Verification because plaintiffs are absent from the County of San Diego where I maintain my office.

Executed this 15th day of July, 2010 at San Diego, California.

TRAVIS E. DOWNS III

CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2011, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 15, 2011.

s/ TRAVIS E. DOWNS III
TRAVIS E. DOWNS III

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: travisd@rgrdlaw.com

# Mailing Information for a Case 2:11-cv-00133-MJP

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Karl Phillip Barth**
  karlb@hbsslaw.com,shelby@lmbllp.com,dawn@hbsslaw.com,shelbys@hbsslaw.com
- **Steve W. Berman**
  steve@hbsslaw.com,robert@hbsslaw.com,heatherw@hbsslaw.com,carrie@hbsslaw.com
- **Jerome F Birn , Jr**
  jbirn@wsgr.com,eblackey@wsgr.com
- **Patrice L Bishop**
  pbishop@ssbla.com,service@ssbla.com
- **Clifford A Cantor**
  cacantor@comcast.net,cliffcantor@hotmail.com
- **Nicole L. Chessari**
  nchessari@wsgr.com,pmarquez@wsgr.com
- **Travis E Downs , III**
  travisd@rgrdlaw.com,e_file_sd@rgrdlaw.com
- **Dan Drachler**
  ddrachler@zsz.com,acabassa@zsz.com,mstocker@labaton.com
- **Tamara J Driscoll**
  TamaraDriscoll@alumni.nd.edu,e_file_sd@rgrdlaw.com
- **Juli E. Farris**
  jfarris@KellerRohrback.com,ltardiff@KellerRohrback.com
- **Jonathan Gardner**
  jgardner@labaton.com,fmalonzo@labaton.com
- **Jacob A. Goldberg**
  jgoldberg@faruqilaw.com
- **Mark S. Goldman**
  mgoldman@labaton.com,ElectronicCaseFiling@labaton.com
- **Benny C Goodman , III**
  bennyg@rgrdlaw.com,e_file_SD@rgrdlaw.com
- **Francis M Gregorek**

gregorek@whafh.com

- **Serena Hallowell**
  shallowell@labaton.com,ElectronicCaseFiling@labaton.com
- **Willem F. Jonckheer**
  wjonckheer@schubertlawfirm.com
- **Lewis S Kahn**
  lewis.kahn@kgscounsel.com
- **Barry M Kaplan**
  bkaplan@wsgr.com,plane@wsgr.com,rcarter@wsgr.com,ibaramblackwell@wsgr.com
- **Elizabeth Ann Leland**
  bleland@kellerrohrback.com,dwilcher@kellerrohrback.com
- **Richard A Lockridge**
  ralockridge@locklaw.com,bmemmons@locklaw.com
- **Matthew S. Melamed**
  mmelamed@rgrdlaw.com,e_file_SF@rgrdlaw.com
- **Kim E Miller**
  kim.miller@ksfcounsel.com
- **Jennifer Rust Murray**
  jmurray@tmdwlaw.com,bkinsey@tmdwlaw.com,enordby@tmdwlaw.com,filing@tmdwlaw.com
- **Rachele R Rickert**
  rickert@whafh.com
- **Karen H Riebel**
  khriebel@locklaw.com
- **Lynn Lincoln Sarko**
  lsarko@kellerrohrback.com,cengle@kellerrohrback.com
- **Dustin L. Schubert**
  dschubert@schubertlawfirm.com
- **Robert C Schubert**
  rschubert@schubertlawfirm.com,dschubert@schubertlawfirm.com
- **Norman J. Slawsky**
  nslawsky@gmail.com,gbjackson@gmail.com
- **Beth E Terrell**
  bterrell@tmdwlaw.com,bkinsey@tmdwlaw.com,enordby@tmdwlaw.com,filing@tmdwlaw.com

- **Roger M Townsend**
  rtownsend@bjtlegal.com,admin@bjtlegal.com
- **Anthony Vozzolo**
  avozzolo@faruqilaw.com
- **Gregory L Watts**
  gwatts@wsgr.com,lbeltran@wsgr.com,nchessari@wsgr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)