UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

|  |  |
|---|---|
| In re COINSTAR INC.<br><br>SECURITIES LITIGATION<br><br>This Document Relates To:<br><br>The Securities Class Action | CASE NO. C11-133 MJP<br><br>ORDER ON MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT |

This matter comes before the Court on Defendants' motion to dismiss Plaintiff's Consolidated Amended Complaint ("CAC"). (Dkt. No. 83.) Having reviewed the motion, Defendants' request for judicial notice (Dkt. No. 85), Plaintiff's response to the motion (Dkt. No. 93), Plaintiff's response to the request for judicial notice (Dkt. No. 94), Defendants' reply in support of the motion (Dkt. No. 96), Defendants' reply in support of judicial notice (Dkt. No. 98) and all related filings, the Court GRANTS in part and DENIES in part Defendants' motion to dismiss and GRANTS in part and DENIES in part Defendants' request for judicial notice.

\\

\\

## Background

Plaintiff Employees' Retirement System of the State of Rhode Island ("Plaintiff") brings this action against Defendant Coinstar, Inc. ("Coinstar") and five individual Coinstar executives pursuant to § 10(b) and § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5.

Coinstar is a Delaware corporation with its principal place of business in Bellevue, Washington. Approximately eighty percent of Coinstar's revenues are generated by Redbox, its wholly-owned subsidiary. (CAC ¶ 60.) Redbox is primarily focused on renting standard definition, new release DVDs to consumers for $1 per night. Redbox offers DVD rentals via 30,000+ self-service kiosks, primarily located in mass retailers, drug stores, restaurants, and convenient stores. Defendant Paul Davis is Coinstar's Chief Executive Officer ("CEO"); Defendant Gregg Kaplan was Coinstar's President and Chief Operating Officer ("COO") during the Class Period; Defendant J. Scott Di Valerio is Coinstar's Chief Financial Officer ("CFO"); Defendant Galen Smith is Coinstar's Corporate Vice President, Finance and Treasurer; and Defendant Donald Rench is Coinstar's General Counsel and Corporate Secretary. (CAC ¶¶ 36-40.)

Plaintiff alleges Defendants provided misleading guidance, beginning on October 28, 2010, about its fourth quarter 2010 ("4Q10") and fiscal year 2010 ("FY10") revenues while being aware of factors adversely affecting Coinstar's Redbox business. Defendants reiterated the misleading guidance during various conferences in November 2011; however, on January 13, 2011, they eventually notified the public of a shortfall. Coinstar refered to the approximate shortfall of eleven percent in its 4Q10 earnings. In response, Coinstar's stock price decreased more than twenty-seven percent from $56.95 on January 13, 2011 to $41.50 the day after. On

February 3, 2011, when Coinstar issued a press release announcing its actual 4Q10 and FY10 financial results, Coinstar's stock price again decreased from $44.24 to $38.96 on February 4, 2011.

According to Plaintiff, Defendants' statements from October 28, 2010 until February 3, 2011, were false and misleading because Defendants knew or shoud have known Coisntar would not meet the guidance. Plaintiffs allege five factors were negatively impacting Redbox's revenues. First, three major studioes were no longer providing Redbox with movies in physical formats like DVDs on the day of their release. Prior to December 2008, Redbox had received DVDs from studios at the same time as they were releasing movies to retailers selling the DVDs. Concerned that Redbox's one dollar rentals hurt DVD sales, however, studios started delaying release of their movies to Redbox and, at one point, refused to release DVDs to Redbox at all. (CAC ¶¶ 93, 94.) As a workaround, Redbox was forced to purchase DVDs from retail outlets in order to stock its kiosks. (CAC ¶¶ 10, 12, 68, 73.) Eventually, Redbox sued Universal Studios Home Entertainment, Twentieth Century Fox Home Entertainment, and Warner Home Video and, at the end of the litigation, in February and April of 2010, Redbox entered into "28-Day Delay Agreements." Under the agreements, Redbox would receive new releases 28 days after three studios first released movies through other channels. (CAC ¶ 75.) Plaintiffs allege Redbox suggested the 28-Day Delay Agreements would impact revenue and earnings for a transition period in the second quarter of 2010, but failed to warn investors that the 28-Day Delay Agreements would have a long-lasting impact on Redbox's business.

Second, Defendants failed to disclose Redbox's introduction of a new physical format to its kiosks, i.e., Blu-ray discs, was not going well. According to CW5, a former Redbox Operations Manager in the Dallas/Ft. Worth area, Redbox prepared a "thinning report" which

provided information about the rental value of DVDs in percentages. The majority of Blu-rays had a "rental value" of zero. Since Redbox received daily results from every kiosk in its chian, Plaintiff alleges Defendant knew or must have known about the disappointing Blu-ray sales.

Third, Plaintiff alleges Defendants knew Coinstar's October 2010 revenues did not track consistently with internal projections. (CAC ¶¶ 97-102.) According to CW1, a former Chief Accounting Officer ("CAO") at Redbox duing the Class Period, when Coinstar issued its guidance on October 28, 2010, Defendants had almost a month's worth of daily revenue results showing sales were below projections previously forecasted. In fact, Defendants had internally "reforecasted" projections downward for the remaining two months of the quarter. (CAC ¶ 100.) Plaintiff alleges Defendants misled the public because they either received weekly reports or attended monthly meetings and should have been aware of Coinstar's disappointing early 4Q10 results.

Fourth, Defendants should have known DVDs scheduled for 4Q10 were weak titles. Specifically, Plaintiffs allege Defendants failed to disclose the 28-Day Delay Agreements shifted Redbox release dates into January and the box office revenue for the titles were below that of the year before. (CAC ¶¶ 117-21.)

Fifth, Defendants failed to disclose Redbox faced a "migration" problem, i.e., people would rent from indoor Redbox kiosks but would return them to outdoor kiosks. (CAC ¶¶ 110-13.) According to CW5, this required Redbox to routinely re-deploy discs from outdoor kiosks to indoor kiosks. Given that a strategy was put in place to address the migration problem, Plaintiff alleges Coinstar knew of the problem as early as December 2009 but failed to disclose its impact on Redbox's business.

Based on Defendants' failure to disclose the risks above, Plaintiff sues on behalf of itself and all other persons and entities who purchased or otherwise acquired common stock of Coinstar between October 29, 2010 and February 3, 2011, when Coinstar issued corrective disclosures (the "Class Period"). Based on Defendants' statements, Plaintiff asserts three claims: (1) primary liability under § 10(b) of the Exchange Act and Rule 10b-5(b) against Coinstar, Davis, Di Valerio, Kaplan and Rench; (2) scheme liability under §10(b) of the Exchange Act and Rule 10b-5(a) and (c) against all Defendants, and (3) control liability under § 20(a) of the Exchange Act against Coinstar, Davis, Di Valerio, Kaplan and Rench.

## Discussion

1. Standard

On a Rule 12(b)(6) motion to dismiss, the Court must assess the viability of the CAC. Dismissal is appropriate where a complaint fails to allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). The Supreme Court has recently clarified that "[a] claim has facial plausibility when the plaintiff plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the conduct alleged." Ashcroft v. Iqbal, ⎯⎯ U.S. ⎯⎯, 129 S.Ct. 1937, 1949 (2009); see also Moss v. United States Secret Serv., 572 F.3d 962, 969 (9th Cir. 2009) ("In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief.") (citing Iqbal, 129 S.Ct. at 1949).

In addition, where the claims concern securities fraud, the claimant must satisfy more stringent standards established by the Private Securities Litigation Reform Act ("PSLRA"). The

PSLRA mandates that, in any private action in which the plaintiff alleges that a defendant made an untrue statement of material fact or omitted to state a material fact, the complaint must:

> [S]pecify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u–4(b)(1). The plaintiff must attribute the misleading statements upon which the claim is based to a particular defendant. Further, the PSLRA requires plaintiffs plead scienter. Specifically, the PSLRA states:

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged…state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(2). Failure to satisfy the PSLRA's heightened pleading standard requires dismissal of the complaint. 15 U.S.C. § 78u–4(b)(3)(A).

    2. <u>Primary Liability – Rule 10b-5(b)</u>

        a. <u>Safe Harbor and Falsity</u>

Defendants argue Plaintiff's primary liability claims should be dismissed because Defendants' statements are protected by the "safe harbor" provisions of the PSLRA, and Plaintiff fails to adequate plead Defendants' statements are false.

The "safe-harbor" provisions of the PSLRA protect two kinds of statements: (1) forward-looking statements accompanied by "meaningful cautionary language," and (2) forward-looking statements which are made without actual knowledge of their falsity. 15 U.S.C. § 78u-5(c)(1)(A),(B); <u>see also</u> <u>In re Cutera Sec. Litig.</u>, 610 F.3d 1103, 1111-12 (9th Cir. 2010). In order to be meaningful, a cautionary statement must be more than a recitation of mere

generalized risks or mere boilerplate language which could be applicable to any business venture. In re Champion Enters., Inc. Sec. Litig., 144 F. Supp. 2d 848, 859 (E.D. Mich. 2001).

In addition, to prevail on securities fraud claims under section 10(b) and Rule 10b-5, plaintiffs must specify "each statement alleged have been false or misleading…[and] the reason why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). A statement is false if the statement is not actually believed, there is no reasonable basis for the belief, or the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy. Provenz v. Miller, 102 F.3d 1478, 1487 (9th Cir. 1996).

### i. Projections -- Third Quarter of 2010 Press Release ("3Q10 Press Release")

Plaintiff alleges Defendants' press release issued on October 28, 2010 was misleading. Signed by Di Valerio, the press release announced Coinstar's 2010 third quarter results, raised guidance for FY10 consolidated revenue, and announced 4Q10 guidance that was higher than its actual results in 3Q10. (Dkt. No. 84-2, Chesseri Decl., Ex. 12.)

Having reviewed the 3Q10 Press Release, the Court finds Plaintiff's argument that the 3Q10 Press Release was misleading unpersuasive. The 3Q10 Press Release falls within the PSLRA's safe harbor provision because the earnings projections contained were by definition forward-looking statements and accompanied by sufficient cautionary language. Specifically, a paragraph explains to investors that "actual results may vary materially from the results expressed or implied in [these] statements" and specifically lists a number of risks that may affect performance. (Chesseri Decl., Ex. 12.) Notably, the risks include termination of contracts with retailers, increased services fees to retailers, inability to receive DVDs on the date of their initial release to the public, and DVD inventory challenges. (Id.) These risks mirror what Plaintiff alleges Defendants failed to disclose to the public—i.e., the on-going impact of 28-Day

Delay Agreements, disappointing Blu-Ray sales, mixed October 2010 sales results, weak schedule titles, and migration problems.

To the extent Plaintiff argues Defendants' cautionary language was not "meaningful" because Defendants knew the risks they warned of were not risks at all but actual factors impacting their sales, the Court finds the argument misplaced. While "there is a difference between knowing that any product-in-development may run into a few snags, and knowing that a particular product has already developed [significant] problems," In re Stac Electronic Securities Litigation, 89 F.3d 1399, 1406 (9th Cir. 1996), Plaintiff fails to read PSLRA's safe-harbor provision disjunctively. See In re Cutera Sec. Litig., 610 F.3d 1103, 1113 n.5 (9th Cir. 2010)(rejecting In re See Beyond Tech. Corp. Sec. Litig., 266 F. Supp. 2d 1150, 1165 (C.D. Cal.2003) and determining the safe-harbor could apply even if defendants knew of their statements' falsity). Subsection (A) of the safe harbor provision applies regardless of whether the speaker knows the statement is false. If Defendants' statements meet subsection (A) requirements, i.e., it includes cautionary language, the Court need not conduct a subsection (B) inquiry into the Defendants' actual knowledge. It need not be read together with subsection (B).

Because subsection (A) applies regardless of Defendants' knowledge of the falsity of the statement, the Court finds Defendants' 3Q10 Press Release is protected by the safe harbor provision.

          ii.    Projections -- Third Quarter of 2010 Earnings Call ("3Q10 Earnings Call")

Plaintiff also alleges Davis and Di Valerio made orally misleading statements on October 28, 2011, when they reiterated the guidance provided in Coinstar's 3Q10 Press Release.

Having reviewed the transcript, the Court finds David and Di Valerio's statements reiterating earnings projections on the 3Q10 Earnings Call are protected by the safe harbor

| 1  | provision. During the 3Q10 Earnings Call, Defendants advised investors that actual results may |
| 2  | differ materially from expectations and referred investors to Coinstar's latest 10-K and 10-Q |
| 3  | filings for a full list of risk factors. (Chesseri Decl., Exs. 13.) The statements were forward- |
| 4  | looking and accompanied by cautionary language. While Plaintiff argues mere reference to |
| 5  | public filings is not sufficient cautionary language, Plaintiff's argument relies on cases |
| 6  | considering <u>written</u> press releases that refer investors to SEC filings. <u>See</u> <u>In re Immune</u> |
| 7  | <u>Response Sec. Litig.</u>, 375 F. Supp. 2d 983, 1035 (C.D. Cal. 2005); <u>In re Dura Pharmas., Inc. Sec.</u> |
| 8  | <u>Litig.</u>, 548 F.Supp.2d 1126, 1144 (S.D.Cal. 2008). In contrast, Defendants' statements during |
| 9  | the 3Q10 Earnings Call were made orally. The PSLRA does not require that cautionary |
| 10 | language physically accompany forward-looking oral statements. <u>Employers Teamsters Local</u> |
| 11 | <u>Nos. 175 and 505 Pension Trust Fund v. Clorox Co.</u>, 353 F.3d 1125, 1133 (9th Cir. 2004). |
| 12 | Under the PSLRA, oral forward-looking statements are protected as long as accompanied by an |
| 13 | oral statement referring people to "a readily available written document" that contains cautionary |
| 14 | language and risk factors. 15 U.S.C. § 78u-5(c)(2). Documents filed with the SEC are "readily |
| 15 | available" for purposes of the PSLRA. 15 U.S.C. § 78u-5(c)(3). |
| 16 | Since Defendants' statements reiterating earnings projections were forward-looking and |
| 17 | accompanied by sufficient cautionary language, the Court finds the safe harbor provision applies. |
| 18 |     iii. <u>Seasonality -- Third Quarter of 2010 Quarterly Filing ("3Q10 Form")</u> |
| 19 | Plaintiff alleges Coinstar's 3Q10 Form contained false statements regarding the |
| 20 | seasonality of Coinstar's business. The Court disagrees. Defendants statement in its 3Q10 Form |
| 21 | was that Coinstar's fourth quarter business historically benefitted from seasonality trends. |
| 22 | (Compl. ¶¶ 131-132.) The Court finds the statement was both historically true and actually true |
| 23 | for 4Q10. Coinstar saw higher revenue in the second half of the year than in the first half of the |
| 24 | |

year. (Chesseri Decl., Ex. 1 at 50.). While Plaintiff argues the statement was misleading given that the 28-Day Delay Agreements threw the schedules of titles "out of whack," the seasonality increase is not based solely on the schedule of available titles. An end-of-year up-tick might be attributed to children being on holiday and cold weather keeping people inside. In fact, the seasonality in the 3Q10 Form includes a discussion of the effect of Daylight Savings Time and the start of the school year on Redbox's business. (See Chesseri Decl., Ex. 15.) To the extent Plaintiff also argues 4Q10's up-tick was a result of more kiosks being installed not seasonality, the Court declines to speculate as to the myriad of reasons for 4Q10's revenues. Since Coinstar in fact did experience an up-tick in 4Q10, the Court finds Plaintiff fails to plead adequate facts demonstrating falsity with respect to the 3Q10 Form.

### iv. 28 Day Delay Agreements

Plaintiff alleges Defendants' statements at various conferences regarding the impact of the 28 Day Delay Agreements were misleading. The Court disagrees, finding Plaintiff's arguments rely on partial or incomplete quotations from conference transcripts.

During the 3Q10 Earnings Call, Di Valerio stated in entirety:

> "[C]onsumers responded positively to a steady stream of good content from studios after working through the transition to the 28-day release windows during the second quarter. We also continued to work with and improve our understanding of the impact of the 28-Day window from certain studios. We are pleased with what we've accomplished in Q3, and looking at Q4, we continue to expect strong same-store sales growth."

(Dkt. No. 84-2, Chesseri Decl., Ex. 13.) The Court finds the statement is not adequately pled as false. While Plaintiff argues Di Valerio refers to a "transition" during the second quarter, Plaintiff fails to read Di Valerio's statement in context. Di Valerio explicitly acknowledges in the following sentence the need to "improve [Redbox's] understanding of the impact of the 28-

Day window from certain studios." Id. Thus, Di Valerio refers to both the transition period and the future impact the agreements would have on Redbox's business.

Similarly, Plaintiff fails to allege falsity with respect to Davis's statements during Morgan Stanley's November 17th, 2011 TMT Conference. At the conference, an analyst asked Davis, "Can you talk a little bit about the evolution of where you are with the studios, and what you've seen in some of the studios where you've created a 28-day window for—kind of a sell-through window?" (CAC, Ex. I.) Davis responded by stating, "We had issues with three studios that we were struggling with, and the good news is most of all of that is behind us." (CAC, Ex. I.) Plaintiff argues Davis's statement misled investors into believing the impact of the 28 Day Delay Agreements was over. The Court disagrees. Davis's statement was in response to an analyst's specific question about Coinstar's relationship with certain studios—not about the impact of the agreements. While Plaintiff argues Davis should have disclosed the financial impact of the 28 Day Delay Agremeents on Coinstar's business, in context, the analyst's question asked only for a snapshot of Coinstar's studio relationships, which David provided.

Likewise, Defendants' statements during Morgan Stanley's November 17th C&R Conference are not adequately pled as false. Di Valerio stated:

> "On the 28-Day window, we are in the second quarter of the 28-day window and we are continuing to learn a lot about that. We had predicted and thought that the revenue for a 28-day title would be lower because the demand would be lower since it is coming out 28 days later, that is coming true certainly, but again it is in line with what we had expected."

(CAC, Ex. J.) As in the 3Q10 Earnings Call, Di Valerio again referred to the second-quarter transition but also acknowledged Redbox's continuing need to adjust to the 28 Day Delay Agremeents.

Read in their entirety, Defendants' statements do not suggest the 28 Day Delay Agreements were limited to the second quarter of 2010. The Court finds Plaintiff failed to adequately plead Defendants' discussion of the 28-Day Delay Agreements during the 3Q10 Earnings Call, November 17th TMT Conference, and November 17th C&R Conference were false or misleading.

       v. Blu-ray Discs

Plaintiff alleges Defendants' statements about Redbox's introduction of Blu-ray discs were misleading because they did not disclose Blu-Ray's disappointing performance. The Court disagrees, finding Plaintiff's arguments again rely on partial or incomplete quotations from conference transcripts.

In a November 16, 2011 presentation to analysts at the Merriman Capital Investor Summit ("November 16th Summit"), Di Valerio stated, "We have put in Blu-ray in the kiosks…And as that continues to expand as a percent of the kiosk I think that's a natural price increase because people are – will begin to rent Blu-ray versus standard def on certain titles." (CAC, Ex. H.) The Court finds the statement in no way suggests Blu-ray was performing well in 4Q10. Similarly, Di Valerio's statement at the November 17th C&R Conference was not false or misleading. Di Valerio stated, "[W]e are pretty pleased with the performance of the Blu-ray titles." (Chesseri Decl., Ex. 25.) The Court finds the statement was mere puffery. See In re Cutera, 610 F.3d at 1111 (finding vague statements of optimism like "good" or other feel good monikers do not amount to a securities violation). While Plaintiff argues Di Valerio could not have been pleased given Blu-ray's disappointing sales, Di Valerio's statement must be read in context. Di Valerio said he was "pleased" only after observing, "we really are on early days in the Blu-ray space" and "we had very few Blu-ray titles or content in the kiosks at the end of the

third quarter." (Chesseri Decl., Ex. 25.) Plaintiff omits Di Valerio's statement immediately following:

> "We are trying to get smarter on which genres are best for Blu-ray because not necessarily all genres play well in Blu-ray today, and so we will continue to work and focus on that. . . . I will tell you they are pretty much in line with what we had expected as we began the slow launch of the Blu-ray titles." (Id.)

In other words, Plaintiff interprets Di Valerio's statements out of context. Since Di Valerio observed Redbox was early in its introduction of Blu-ray discs and acknowledged challenges in marketing them to the public, the Court finds the statements were not adequately plead as false.

      vi. <u>Projections – Nov. 16th Summit and Nov. 17th C&R Conference</u>

Plaintiff alleges Defendants' statements reiterating earnings projections during the November 16th Summit and November 17th C&R Conference were false and/or misleading. The Court agrees that these statements are adequately plead.

First, the statements are not protected by the safe harbor provision. During the November 16th Summit and November 17th C&R Conference, Di Valerio reiterated the earnings projections without providing any cautionary language, as Defendants had during the 3Q10 Press Release. While Defendants request judicial notice of PowerPoint slides used at the November conferences which referred analysts to SEC filings, the Court declines to consider them. (See Chesseri Decl., Exs. 20 and 21.) On a motion to dismiss, the Court "may not consider matters outside the pleadings" unless the documents' "authenticity . . . is not contested and the plaintiff's complaint necessarily relies on them." <u>Lee v. City of Los Angeles</u>, 250 F.3d 668, 688 (9th Cir. 2001). Since they are not included as part of the pleadings and Plaintiff contests their authenticity, the Court will take no notice of the PowerPoint slides. Considering the transcripts alone, Defendants' statements did not contain sufficient cautionary language for the safe harbor provision to apply. (CAC Exs. H, J.)

1 | Second, the statements are adequately pled as false or misleading. CW1 alleges

2 | Defendants internally re-forecasted Coinstar's guidance downward for 4Q10. While Defendants

3 | challenge the voracity of CW1's testimony, on a motion to dismiss, the Court accepts CW1's

4 | testimony as true. Since CW1 was the CAO during the Class Period and the testimony is

5 | sufficiently specific, the Court finds Di Valerio's statement announcing increased guidance,

6 | when Coinstar was internally re-forecasting guidance downward, was false when made.

7 | The Court DENIES Defendants' motion to dismiss claims related to Di Valerio's

8 | statements reiterating earnings projections during the November 16th Summit and November

9 | 17th C&R Conference. The statements are not protected by the safe harbor provision and are

10 | adequately pled as false.

### vii. Title Strength – 3Q10 Earnings Call

12 | Plaintiff's statement regarding title strength is not protected by any safe harbor provision

13 | and is adequately pled as false. During the 3Q10 Earnings Call, Di Valerio stated, "The fourth

14 | quarter has historically been our strongest quarter, and that's built into our guidance. The current

15 | schedule of titles looks very strong, despite several titles shifting to later in the quarter or into

16 | 2011." (CAC ¶ 129)

17 | First, Di Valerio's statement regarding titles strength is not protected by the safe harbor

18 | provision because the provision only protects forward-looking statements. While Defendants

19 | attempt to argue Di Valerio was merely predicting the titles would rent well in the future, the

20 | Court disagrees. As plainly read, Di Valerio's statement assessed the current schedule of

21 | Redbox titles. Second, Di Valerio's statement is adequately pled as false. As alleged, Di

22 | Valerio stated the titles "looked strong" even though DVDs scheduled for release in 4Q10 had

23 | box office sales sixteen percent lower than 4Q09, many of those that were box office hits were

24 |

1  animated movies which have lower rental rates, and many would not be released to Redbox until
2  after the holidays due to the 28 Day Delay Agreements.  To the extent Defendants argue the
3  4Q10 titles included twelve movies grossing over $100 million in the box office and was,
4  therefore, strong, the dispute is a factual one, inappropriate for resolution on a motion to dismiss.
5  In addition, Defendants' argument would require the Court to take judicial notice of documents
6  Plaintiff objects to and which are outside of the complaint.  The Court declines to do so; even if
7  Defendants' documents contained the same content as those relied upon in the Complaint or
8  were taken from the same websites, to consider them would convert this motion to dismiss into a
9  motion for summary judgment.
10  Since Plaintiff alleges several factors showing 4Q10 titles were known to be weak, the
11  Court finds Di Valerio's statement that the title schedule was "strong" is adequately pled as false.

    b.  Scienter

13  Defendants' final argument is that Plaintiff fails to allege facts giving rise to a strong
14  inference of scienter.  The Court disagrees.
15  Under the PSLRA, plaintiff must plead facts giving rise to a strong inference that
16  defendants acted with scienter—that they "knew or were deliberately reckless to the falsity of
17  their statements." In re Silicon Graphics, Inc. Sec. Litig., 183 F.3d 970, 974 (9th Cir. 1999).  In
18  considering scienter allegations, "courts must . . . accept all factual allegations in the complaint
19  as true [and] consider the complaint in its entirety." Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
20  551 U.S. 308, 322-23 (2007).  Courts must "constantly assum[e] the plaintiff's allegations [are]
21  true," when conducting its "comparative assessment of plausible inferences." Id. at 327.
22  First, CW testimony supports a strong inference of scienter.  CW1, the Redbox CAO
23  during the Class Period, alleges Defendants tracked daily revenue updates reflecting Redbox

ORDER ON MOTION TO DISMISS
CONSOLIDATED AMENDED COMPLAINT- 15

kiosks sales, all Defendants attended monthly business review meetings during the Class Period, and that Coinstar internally reforecasted projections downward. (CAC ¶¶ 97-102.) Defendants' attendance at the monthly business meetings is corroborated by the testimony of CW2 and CW3. While CW3 was not employed during the Class Period, CW2 was a Redbox financial analyst whose boss reported to Defendant Smith. To the extent Defendants argue CW1 was not in a position to know the Defendants' personal awareness of sales data or otherwise discount CW1's testimony, the Court finds Defendants' argument unavailing. CW1 is alleged to be in a position to report on these facts and, on a motion to dismiss, the Court assumes Plaintiff's allegations are true. See Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1230 (9th Cir. 2004)(finding specific statements by former employees and managers as sufficient to support scienter). Since CW1's testimony provides "specific allegations" about Defendants' awareness of sale data, the Court finds it gives rise to a strong inference of scienter.

Second, Defendants' positions within Coinstar create a strong inference of scienter. Under the core operations doctrine, allegations regarding management's role in a company help to satisfy the PSLRA scienter requirement when: (1) together with other allegations, they raise an inference of scienter that is cogent and compelling, (2) they show defendants had actual access to the disputed information, or (3) in rare circumstances, where the nature of the relevant fact is of such prominence that it would be "absurd" to suggest that management was without knowledge. South Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 785 (9th Cir. 2008). While the Court agrees with Defendants that the core operations doctrine's third prong is rare, it is the first prong that applies here. As discussed above, CW1 and CW2 provide detailed allegations that Defendants knew about the on-going challenges presented by the 28 Day Delay Agreements.

Combined with these detailed allegations, Defendants' roles as executive officers support a strong inference of scienter.

Defendants argue other factors suggest the allegedly misleading statements were made without scienter. The Court is unpersuaded. Regardless of whether Defendants had a motive to mislead investors, a motive is not necessary for a finding of scienter. See Telllabs, 551 U.S. at 322-23 (absence of a motive allegation is not fatal). In addition, Redbox's realization that it over-purchased January titles in 4Q10 does not overcome the inference of scienter. If Defendants did over-purchase titles, there are many fact-based reasons for why this may have occurred. It does not, post-hoc, confirm Defendants were as optimistic about 4Q10 as their statements suggested. Finally, Defendants' argument that its guidance already incorporated the alleged business challenges is unavailing. Defendants rely on In re Zumiez Inc. Sec. Litig. to argue "nothing suggests that [defendants] did not factor [in] [negative] considerations into their calculations." No. 07-1980, 2009 WL 901934 at *12 (W.D.Wa. March 30, 2009). But Zumiez is distinguishable. In Zumiez, the plaintiff alleged a retail chain's guidance about earnings per share was materially false and misleading statements given that the company suffered from internal problems such as over-expansion and merchandise theft. Id. at *4. However, the court in Zumiez observed, "the Company's various projections over the course of the 2007 fiscal year appear perfectly reasonable and consistent with prior performance." Id. at *6. In contrast, Coinstar issued a guidance analysts considered "a blowout." While Defendants point to several positive factors that justified Coinstar's strong 4Q10 and FY2010 forecasts, the inference remains that Coinstar increased its guidance despite on-going business challenges.

Considering CW1's testimony and Defendants' positions within Coinstar, the Court finds the plausible inference alleged is that Defendants acted with scienter.

1    3. <u>Kaplan, Rench and Smith</u>

Defendants argue Kaplan, Rench, and Smith should be dismissed from this action because they did not make any of the allegedly misleading statements. The Court agrees.

First, Kaplan, Rench, and Smith are not liable under Rule 10b-5(b). As held in <u>Janus Capital Group, Inc. v. First Derivative Traders</u>, liability does not expand beyond the person or entity that ultimately has authority over a false statement or omission. -- U.S. --, 131 S. Ct. 2296 (2011). While the Supreme Court in <u>Janus</u> considered whether a business entity could be held liable for a prospectus issued by a separate entity, its analysis applies equally to whether Kaplan, Rench, and Smith may be held liable for the misstatements of their co-defendants. Here, the only statements that are actionable are those of other executive officers at various conferences. To the extent Plaintiff relies on <u>BP Prudhoe Bay</u> to argue Kaplan, Rench and Smith are liable based on the group pleading doctrine even after <u>Janus</u>, the Court finds the argument unavailing. <u>See</u> No. 06-1505, 2007 WL 3171435 (W.D. Wash. October 26, 2007). Unlike <u>BP Prudhoe Bay</u>, which applied the group pleading doctrine, this is not the case where the false statements appeared in annual reports or a press release that "is the collective action of officers and directors." <u>Id.</u> at *7. Since they did not make any of the misleading statements that are actionable, Kaplan, Rench, and Smith are not adequately alleged to be liable.

Second, Kaplan, Rench and Smith are not liable under § 10b-5(a) or (c) of the Exchange Act. Under Rule 10b–5(a) or (c), i.e., scheme liability, a defendant who uses a "device, scheme, or artifice to defraud," or who engages in "any act, practice, or course of business which operates or would operate as a fraud or deceit," is liable for securities fraud. 17 C.F.R. § 240, Rule 10b–5. A plaintiff does not make out a scheme liability claim under Rule 10b-5(a) and (c) when the sole basis for such claims is alleged misrepresentations or omissions. <u>WPP Luxembourg Gamma</u>

Three Sarl v. Spot Runner, Inc., -- F.3d --, 2011 WL 3673116 at *14 (9th Cir. Aug. 23, 2011)(quoting Lentell v. Merrill Lynch & Co., 396 F.3d 161, 177 (2d Cir. 2005)). Here, Plaintiff alleges Defendants "engaged in the preparation, creation, development, and dissemination of the false financial guidance and suppressed the revised internal forecast." (Pltf's Resp. Br. at 32.) At oral arguments, Plaintiff suggested the Defendants' mere attendance at the November conferences subjects them to liability. The Court finds Plaintiff's argument goes too far and declines to draw an inference of scheme liability based on attendance at a conference. Since the sole basis for Plaintiff's § 10b-5(a) or (c) against Kaplan, Rench, and Smith is based on allegations underpinning a § 10b-5(b) claim, the Court DISMISSES the scheme liability claims against Rench, Smith and Kaplan for failure to state a claim.

4. Control Liability – Section 20(a) of the Exchange Act

Plaintiffs also assert a claim under § 20(a) of the Exchange Act against Davis, Di Valerio, Rench and Kaplan. Section 20(a) provides derivative liability for those who control others found to be primarily liable under the Act. See Johnson v. Ajian, 490 F.3d 778, 781 n.11 (9th Cir. 2007); Cho v. UCBH Holdings, Inc., No. 09-4208, 2011 WL 3809903 (N.D. Cal. May 17, 2011). To claim "control person" liability under § 20(a), Plaintiff must demonstrate "'a primary violation of federal securities law' and 'that the defendant exercised actual power or control over the primary violator.'" Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 990 (9th Cir. 2009). Since Plaintiff adequately alleges Di Valerio made misrepresentations about its guidance at conferences in November and Defendants do not contest that Di Valerio is a control person, the Court finds Plaintiff's § 20(a) claim is sufficiently pled as to Di Valerio. Since the remaining Defendants are not primarily liable and exercised no control over Di Valerio, the Court dismisses them from this action.

## Conclusion

The Court GRANTS in part and DENIES in part Defendants' motion to dismiss. The safe harbor provision protects Defendants' statements made in the 3Q10 Press Release and 3Q10 Earnings Call regarding 4Q10 earnings projections. In addition, Plaintiff fails to adequately plead Defendants' statements regarding the 28 Day Delay Agreements, seasonality, and Blue-Ray sales are false. As to those statements, the Court GRANTS Defendants' motion to dismiss Plaintiff's claims.

With respect to Defendants' remaining statements, the Court DENIES Defendants' motion to dismiss. The Court finds Di Valerio's statements during the November 16th Summit and November 17th C&R Conference regarding 4Q10 earnings projections are not protected by the safe harbor provision and Plaintiff's allegations are adequately pled as false. In addition, Di Valerio's statement during the 3Q10 Earnings Call as to the strength of the current schedule of titles was not forward-looking and adequately pled as false.

In addition, the Court DISMISSES all claims against Kaplan, Rench, and Smith because: none were the "speaker" of the alleged misstatements, no claim exists based on scheme liability, and none exercised control over the primary violators and are, therefore, not subject to control liability under § 20(a) of the Exchange Act. While the Court takes judicial notice of Defendants' documents to which Plaintiff does not object, the Court DENIES Defendants' request for judicial notice of various PowerPoint presentations and movie websites.

The clerk is ordered to provide copies of this order to all counsel.

Dated this 6th day of October, 2011.

Marsha J. Pechman
United States District Judge

ORDER ON MOTION TO DISMISS
CONSOLIDATED AMENDED COMPLAINT- 20